IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | |
|---|---|
| Abner Carvajal, ) | |
| ) | Civil Action No. 6:10-3123-HMH-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Hayes & Lunsford Electrical ) | |
| Contractors, Inc., Debbie Hammett, ) | |
| and Mark Hammett, ) | |
| ) | |
| Defendants ) | |
| ) | |

This matter is before the court on the defendants' motion for summary judgment (doc. 15). In his complaint, the plaintiff alleges a state law cause of action for intentional infliction of emotional distress (also referred to as outrage) against his former employer, the electrician with whom he worked, and their mutual supervisor. The plaintiff also alleges claims for hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964, as amended, against his former employer.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civil Rule 73.02(B)(2)(g) DSC, all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## FACTS PRESENTED

Defendant Hayes & Lunsford Electrical Contractors, Inc., is a company providing electrical contracting work for construction projects. The plaintiff was employed by Hayes & Lunsford from February 19, 2007, until August 14, 2009 (Loftis aff. ¶ 2). Hayes & Lunsford has a Harassment Policy in its Handbook that prohibits "(a)ctions, words, jokes or comments based on an individual's . . . race (or) ethnicity" (Loftis aff., ex. 1, Handbook ¶ 4.4). The Policy requires harassment to be reported to a supervisor or human resources

by either the victim of it or a witness to it (*id.*). The plaintiff testified he is aware of the Harassment Policy and recognized it in the Handbook (pl. dep. 53)

The plaintiff, who is of Hispanic descent (compl. ¶ 1) was hired as an electrician, although he worked as an electrician's helper. He was assigned to work with electricians Mike Alverson and, later, Debbie Hammett. Mr. Alverson worked with the plaintiff every day over a three to four month period. He had trouble with the plaintiff's work quality, testifying, "I showed Abner Carvajal how to bend pipe a number of times while he was assigned to me as an electrician's helper. All he had to do was put in line and he couldn't get it right" (Alverson aff. ¶ 3). Howard White, another electrician, tried to teach the plaintiff how to bend conduit and recalls "he didn't get it; he would bend it but not do it the right way" (White aff. ¶ 4). The plaintiff's former supervisor at another job, Bobby Hagman, testified that the plaintiff could not perform minor tasks (Hagman dep. 6)

Mrs. Hammett testified that the plaintiff could not correctly calculate the required measurements in order to bend the pipe (D. Hammett dep. 26). She ended up asking her supervisor, defendant Mr. Hammett, who is also her husband, if she could work by herself and was permitted to do so for a time. However, because the plaintiff was not able to work by himself, she ended up having to work with him again (D. Hammett dep. 27). One morning, Mrs. Hammett had to redo her work four or five times due to incorrect measurements she received from the plaintiff. She was so upset she went to Mr. Hammett and once again asked not to work with the plaintiff (D. Hammett dep. 33). Other workers told Mrs. Hammett that, after she went to see Mr. Hammett, the plaintiff went upstairs where he shook and beat a hammer on the lift and on the wall, saying he did not want to work with her anymore (D. Hammett dep. 36). Mrs. Hammett was scared of the plaintiff due to his previous discussions at the job site about beating his wife and serving time in prison for it (D. Hammett dep. 31).

At some point while working at the Broome High School project, the plaintiff was hit in the back with a block that fell. According to the plaintiff, he refused to go to the doctor out of fear of losing his job and as a result of prior experiences with workers' compensation claims (pl. dep. 89-91).[1]

On July 14, 2009, the plaintiff told Mark Hammett that he was going to the office, which Mr. Hammett took to mean that he no longer wanted to work on the Broome High School job site. Mr. Hammett told the plaintiff that if he walked off the job, he did not know if the plaintiff would have a place to come back to (M. Hammett dep. 50). According to the plaintiff, he told Mr. Hammett that he could not work with Mrs. Hammett anymore. Mr. Hammett told the plaintiff he could "put [him] with somebody else," but the plaintiff did not trust him (pl. dep. 38-39). The plaintiff left the job site and drove to the Hayes & Lunsford office, where he asked to speak to the Project Manager. Ann Loftis, the Office Manager for Hayes & Lunsford, told him that the Project Manager was not in that day (Loftis aff. ¶ 6).

When the plaintiff returned to the office the next day, he sat outside in the parking lot until Ms. Loftis went out and invited him in. The plaintiff then met with Human Resources Manager Jim Hearn and Ms. Loftis (*id.*). The plaintiff reported that he was harassed on the job by Mrs. Hammett (*id.*). The only specific remarks cited by the plaintiff were that Mrs. Hammett "told him to 'get on the ladder,' 'your're to stay on that ladder', and other remarks of this nature" (Loftis aff., ex. 2, Meeting Notes). The plaintiff told Ms. Loftis and Mr. Hearn that "no one said anything derogatory directed at him but there had been conversations in general that he deemed racial" (*id.*). When he was asked to describe the

---

[1] The defendant argues in the motion for summary judgment that the plaintiff is not entitled to recover damages for this back injury as it is barred by the exclusivity provision of the South Carolina Workers Compensation Act. *See* S.C. Code Ann. § 42-1-540. This court agrees. The plaintiff did not respond to this argument in his response, but included facts about the injury in his statement of facts (*see* pl. resp. m.s.j. at 7). It is unclear how the alleged injury is related to the claims presented herein, but, in any event, such damages are not recoverable. *See Menefee v. Westinghouse Savannah River Co.*, No. 96-1439, 1996 WL 694430, at *1 (4th Cir. 1996).

3

comments that were harassing, the plaintiff would state only that he "was being harassed," and refused to give any specifics, merely stating "there was a lot of gossip, harassment, and racial statements made on the job" (*id.*).  The Meeting Notes indicated that the investigation would proceed by obtaining statements from possible witnesses working at the same job site (*id.*).

The plaintiff testified as follows regarding what he told Mr. Hearn and Ms. Loftis, "I limited it.  At that point I didn't want to create an issue.  I felt I was still working there, didn't want to create a racial issue and give all the details as the way Debbie was behaving.  I was actually looking after the interest of the company, which I always have" (pl. dep. 39).

Jim Murray, the Project Manager for Hayes & Lunsford, talked to the plaintiff after he made his complaint (Murray aff. ¶ 7; Loftis aff., ex. 2).  The plaintiff told Mr. Murray he did not want to return to the job site and that he could not work with Mr. and Mrs. Hammett.  Because of the plaintiff's request, Mr. Murray asked the plaintiff if he would like to work on another project at Greenwood High School, and the plaintiff indicated he did (Murray aff. ¶ 7).  The plaintiff admitted in his deposition that he was transferred to another job site at his request (pl. dep. 60).  According to Ms. Loftis' notes, Mr. Murray asked the plaintiff to put his statement in writing and to give the statement to Foreman Richard Lehman in a sealed envelope.  Mr. Lehman reported to Mr. Murray on July 17, 2009, that the plaintiff approached him and told him that he was supposed to give Mr. Lehman something, but he had decided not to do it (Loftis aff., ex. 2).  The plaintiff testified that he does not remember ever being asked to submit a written statement (pl. dep. 61-62).

After his complaint, the plaintiff was sent home until the defendants found him another position at the Greenwood High School project.  According to the plaintiff, he lost 19½ hours of pay during that time (*id.* 64-65).

4

Project Manager Jim Murray went to the Broome High School job site the day after the plaintiff made the complaint and interviewed Hayes & Lunsford employees on site (D. Hammett dep. 37-38; Murray aff. ¶ 4). Mr. Murray concluded that no harassment had occurred regarding the plaintiff, but he did discover a separate instance wherein defendant Mark Hammett made a statement that was considered derogatory to people of Mexican descent in front of two other employees (Murray aff. ¶ 5). Mr. Murray obtained statements from the two employees, Mr. Valencia and Mr. Farmer, on July 15, 2009, and, as a result, Mr. Murray issued a written warning to Mr. Hammett on July 20, 2009 (Murray aff., ex. 1). Mr. Valencia testified that he worked with Mr. Hammett and that was the only time he ever heard him say anything derogatory about his national origin or race, and he never heard Mrs. Hammett make any such comment. The plaintiff was not present when Mr. Hammett made the comment (Valencia aff. ¶ 4).

On July 28, 2009[2], a written statement by the plaintiff was submitted to the defendants (pl. dep. 62-64; def. reply, ex. 2). While the plaintiff does not remember being asked to submit a written statement or whether he was the one who actually gave it to Ms. Loftis, he does admit that the statement is in his handwriting (pl. dep. 62-64). In that statement, the plaintiff claimed that Mark and Debbie Hammett "went around spreading gossip about everything and everyone. Creating mayhem about everything and everyone." The plaintiff claimed Mrs. Hammett would "yell very loudly." He claimed she would yell at him to "get up that ladder." He stated that on the last day he worked with Mrs. Hammett, she became angry because he came down off the ladder. She left to complain to Mr. Hammett, and when she returned, she told the plaintiff that she would not let him bend any more pipes for her, and she would stand and do nothing but watch him. The only racial

---

[2]The statement is incorrectly date stamped March 28, 2009 (def. reply, ex. 2).

5

issue referenced by the plaintiff was that "[r]acial remarks were suppressed after Tony Valencia told them he was of Mexican decent [sic]" (def. reply, ex. 1).

The plaintiff was one of three employees laid off on August 14, 2009 (Loftis aff. ¶ 7; pl. dep. 65-67). The other employees laid off with the plaintiff were Caucasian; one was a foreman, and the other was a top electrician (Loftis aff. ¶ 7). According to the defendants, after work was complete on the Greenwood High School Project, there was no other project to send the plaintiff to because of a decrease in business due to the economy (*id.*). From 2009 through 2010, Hayes & Lunsford laid off 42 employees (Loftis aff., ex. 3). The plaintiff was the only Hispanic laid off; the other 41 were Caucasian (Loftis aff. ¶ 7). The plaintiff admitted in his deposition that business was slow for all construction trades (pl. dep. 22).

When the plaintiff was asked in his deposition to describe how Mrs. Hammett harassed him on the basis of his race, he testified that Mrs. Hammett "is a very out-of-control person, very headstrong, very demanding, causing contradictions in her demands," "abusive verbally, cursing to the top of her lungs," saying, "I'm not working with the mother fucker, he don't know what he's doing" (pl. dep. 25, 27). He claimed Mrs. Hammett said, "'I'm not working with these mother fucking Mexicans . . . '" (*id.* 27). The plaintiff testified:

> [I]f (Mrs. Hammett) was bending pipe and I was taking the measurement and transferring it she had kind of – she was – tried to be meticulous and perfect. And sometimes you had to tweak the pipes in order to fit them in, and she would get angry if the slightest little thing wasn't fitting, wasn't correct. She was trying to work in a perfect world, and there is no perfect world there....And she would tell me, if she would walk away and come back, what the hell are you doing off the ladder; did I tell you to get off the ladder, get the fuck back up that ladder.

(*Id*. 28-29). The plaintiff complained, "they were taking breaks when they shouldn't have... [Mrs. Hammett] would go to the store, running errands, she would go to the trailer to cool herself off in the air condition and take all the time she wanted while we were still out there

working in the field." The plaintiff said, "I was abused in this sense," complaining that he had to climb high heights on the scaffolding but "Debbie never did any climbing," despite the fact that he admitted that was part of his job duties (*id*. 37-38). The plaintiff also testified:

> Their discussions.... [i]t was always talking demeaning other cultures, talking about Mexicans, because the majority of the workers there, the other trade, the block masons were Mexicans. . . . [T]hey just made racial comments . . . these fucking Mexicans . . . most of them are here illegally, they come in this country and they get privileges we don't get as American citizens, they shouldn't be here.

(*Id.* 36). The plaintiff testified that he had no problems with Mark Hammett (*id*. 24).

## **APPLICABLE LAW**

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not

rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the the the the the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.

## ANALYSIS

### *Hostile Work Environment*

To proceed on a Title VII hostile work environment claim, "a plaintiff must show 'that the offending conduct (1)  was unwelcome, (2)  was because of [his race], (3)  was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment, and (4)  was imputable to [his] employer.'" *Ziskie v. Mineta*, 547 F.3d 220, 224 (4th Cir.2008) (quoting *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc)).  Establishing the third element requires that the plaintiff show that the work environment was not only subjectively hostile, but also objectively so. *See EEOC v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 315 (4th Cir.2008).  Such proof depends upon the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id*. (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).  "[C]omplaints premised on nothing more than 'rude treatment by [coworkers],' *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir.2006), 'callous behavior by [one's] superiors,' *Bass v. E.I. DuPont de Nemours &*

8

*Co.*, 324 F.3d 761, 765 (4th Cir.2003), or 'a routine difference of opinion and personality conflict with [one's] supervisor,' *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir.2000), are not actionable under Title VII." *Id.* at 315-16.

The conduct alleged by the plaintiff does not rise to the level of an actionable claim for hostile work environment under Title VII. Specifically, the plaintiff cannot show that the alleged conduct was based upon his race and was sufficiently severe and pervasive to alter the terms and conditions of his employment. Here, the plaintiff complains of the following conduct: Mrs. Hammett yelled at him and cursed at him to stay on the ladder or about his measurements (pl. dep. 28-29); she stated, "I'm not working with the mother fucker, he don't know what he's doing" (*id.* 25, 27); she made him climb the scaffold, but she did not (*id.* 37-38); she would go to the store, running errands, she would go to the trailer to cool herself off in the air condition and take all the time she wanted while [the plaintiff and others] were still out there working in the field" (*id.*); and the Hammetts "went around spreading gossip about everything and everyone. Creating mayhem about everything and everyone" (def. reply, ex. 1). As argued by the defendants, none of this conduct falls within the purview of a Title VII hostile work environment claim. With respect to the third element, Title VII does not protect employees from every instance of unpleasantness in the workplace. *See Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177, 183 (4th Cir. 1998). The Fourth Circuit has acknowledged that Title VII does not attempt to "'purge the workplace of vulgarity.'" *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995)). The plaintiff's complaints suggest that his workplace was unhappy for him, but not because of his race.

The plaintiff makes a number of conclusory accusations to support his allegation that he was subjected to continuous demeaning and degrading behavior because of his race. While he contends that "a lot of racist jokes were made on all job sites about

9

Mexicans," he could not recall the specifics of any such jokes, when they were made, or who made them (pl. dep. 112). "'Such [general] assertions, standing alone, are [simply] insufficient to sustain an actionable Title VII claim.'" *EEOC v. Xerxes Corp.*, 639 F.3d 658, 677 (4th Cir. 2011) (quoting *Gilliam v. South Carolina Dep't of Juvenile Justice*, 474 F.3d 134, 143 (4th Cir.2007)). The plaintiff testified that Mrs. Hammett used the phrase "fucking Mexicans" (pl. dep. 27, 36, 111-12).[3] Considering the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance, it is clear that the alleged conduct does not meet the third element of a *prima facie* case. The plaintiff has not presented evidence of the frequency of such conduct. Furthermore, the phrase, while certainly offensive, is not physically threatening. Lastly, it appears from the evidence that plaintiff's main complaints about the Hammetts, and Mrs. Hammett in particular, were about Mrs. Hammett's demanding personality and how she yelled, cursed, gossiped, and created "mayhem" for "everyone." From the record before the court, it does not appear that this conduct was based upon race (or national origin)[4].

Based upon the foregoing, the plaintiff's hostile work environment claim should be dismissed.

---

[3] Mrs. Hammett testified that she had never used the phrase "fucking Mexicans," but she had used the phrase "damn Mexicans" (D. Hammett dep. 19). In his brief in opposition to the motion for summary judgment, the plaintiff argues that he "was subjected to verbal abuse from Debbie Hammett, with the use of terms such as 'damn Mexicans,' that was reported to Mark Hammett, and about which nothing was done" (pl. resp. m.s.j. 2 (citing D. Hammett dep. 19; pl. dep., 27, 36, 111-13)). The deposition testimony cited by the plaintiff does not contain any reference to the plaintiff reporting to Mr. Hammett that Mrs. Hammett used such a phrase.

[4] The plaintiff alleges only racial discrimination in his complaint.

*Retaliation*

To succeed on a retaliation claim, a plaintiff must prove that (1) he engaged in a protected activity, (2) the employer acted adversely against him, and (3) there was a causal connection between the protected activity and the asserted adverse action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011). "If a plaintiff 'puts forth sufficient evidence to establish a *prima facie* case of retaliation' and a defendant 'offers a non-discriminatory explanation' for his termination, the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Id.* (quoting *Yashenko v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2006)).

The plaintiff alleges that Hayes & Lunsford retaliated against him by transferring him to the Greenwood High School project after he made a complaint to Mr. Hearn and Ms. Loftis and later laying him off when the project ended (*see* comp. ¶ 39). The defendants note that the plaintiff was transferred to a different job site at his request (*see* pl. dep. 59-60; Murray aff. ¶ 7). Mr. Murray testified that he told the plaintiff they wanted to send him back to work at Broome High School; however, the plaintiff refused and said he would not work with the Hammetts. Mr. Murray told the plaintiff that the only other project he had was Greenwood High School, and the plaintiff responded that he would like to go there (Murray dep. 22-23). Furthermore, the defendants contend that the plaintiff was ultimately laid off due to lack of work with two other employees when the Greenwood High School project ended (Loftis aff. ¶ 7). The defendants have presented evidence that 42 employees were laid off from 2009 through 2010 (Loftis aff., ex. 3).

Assuming the plaintiff can establish a *prima facie* case of retaliation, the plaintiff cannot establish that the proffered explanation was pretext for discrimination. The plaintiff argues in his opposition to the motion for summary judgment that he reported to Mr. Hammett that he was being harassed by Mrs. Hammett because of his race (pl. resp. m.s.j. at 2, 4) and that Mr. Hammett "specifically threatened Plaintiff with termination if he were

11

to make any attempt at filing a report" (*id..* at 12).  This argument is not supported by the plaintiff's deposition testimony wherein he testified that he simply told Mr. Hammett that he could not work with Mrs. Hammett any more (pl. dep. 38-39).  The plaintiff's deposition testimony is corroborated by Mr. Hammett's testimony (*see* M. Hammett dep. 48).  There is also no evidence that the plaintiff told Mr. Hammett that he was leaving the job site to file a complaint; he simply said that he was going to the office (*id.* 49-50).  According to Mr. Hammett, he told the plaintiff that if he walked off the job, he did not know if he would still have a job (*id.* 50).  There is absolutely no evidence that Mr. Hammett threatened the plaintiff with termination if he made a report as alleged by the plaintiff.

In support of his retaliation claim, the plaintiff also argues that Hayes & Lunsford did not properly investigate his complaint of harassment (pl. resp. m.s.j. at 2). However, the record contains a three page report entitled "Abner Carvajal Harassment Claim" that was prepared at the time the plaintiff made his complaint to Ms. Loftis and Mr. Hearn (*see* Loftis aff., ex. 2).  The report documents the July 15th interview with the plaintiff and states that the investigation would "proceed further . . . by obtaining statements from other possible witnesses on the Broome High School jobsite" (*id.*).  Mr. Murray testified he was informed of the plaintiff's complaint by Ms. Loftis at which time he contacted the plaintiff and spoke with him and then interviewed employees at the job site (Murray dep. 21-24). The report further indicates that Mr. Murray asked the plaintiff to write a statement (Loftis aff., ex. 2).  While the plaintiff does not remember this request, a written statement by the plaintiff was ultimately submitted to the defendants (pl. dep. 62-64; def. reply, ex. 2).  The report also includes the finding by Ms. Loftis and Mr. Murray that the plaintiff "failed to give . . . any solid examples of where he was personally racially harassed or witnessed racial harassment" (Loftis aff., ex. 2).  Accordingly, the investigation was closed.

During his investigation, Mr. Murray discovered a separate instance wherein defendant Mark Hammett made a statement in front of two other employees that was

considered derogatory to people of Mexican descent (Murray aff. ¶ 5).  Mr. Murray obtained statements from the two employees, Mr. Valencia and Mr. Farmer, on July 15, 2009, and, as a result, Mr. Murray issued a written warning to Mr. Hammett on July 20, 2009 (Murray aff., ex. 1).  Mr. Valencia testified that he worked with Mr. Hammett and that was the only time he ever heard him say anything derogatory about his national origin or race, and he never heard Mrs. Hammett make any such comment.  The plaintiff was not present when Mr. Hammett made the comment (Valencia aff. ¶ 4).  The plaintiff attempts to impugn the investigation because the two witness statements obtained by Mr. Murray "in no way touch on the verbal abuse suffered by Plaintiff at the hands of Debbie Hammett" (pl. resp. m.s.j. at 6).  However, Mr. Valencia specifically testified that the comment he told Mr. Murray about was the *only* comment of that nature that he ever heard Mr. Hammett make, and he never heard Mrs. Hammett make such a comment (Valencia aff. ¶¶ 3-4).

The plaintiff has failed to bear his burden of establishing that the reason given for his discharge was pretext for discrimination.  Accordingly, summary judgment is appropriate on this claim.

### *Intentional Infliction of Emotional Distress*

The plaintiff also alleges a state law claim for intentional infliction of emotional distress.  Having found that the defendants are entitled to summary judgment on the plaintiff's federal claims, it is recommended that the court decline to exercise supplemental jurisdiction over any claims for relief asserted pursuant to state law.  *See* 28 U.S.C. § 1367(c) (3).

13

**CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, this court recommends that the defendants' motion for summary judgment (doc. 15) be granted.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald<br>United States Magistrate Judge

January 12, 2012
Greenville, South Carolina